**PLASTERERS LOCAL UNION NO. 79, OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Texas State Tile & Terrazzo Co., Inc., et al., and Local Union 20 Bricklayers, etc., Local Union 108 International Association of Marble, etc., Polishers, et al., Intervenors.

No. 22073.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1969.

Decided June 30, 1970.

Petition for Rehearing Denied October 1, 1970.

Certiorari Granted March 22, 1971. See 91 S.Ct. 1195.

MacKinnon, Circuit Judge, dissented and filed opinion.

Mr. Donald J. Coapuano, Washington, D. C., with whom Mr. Martin F. O'Donoghue, Washington, D. C., was on the brief, for petitioner.

Mr. Peter Ames Eveleth, Atty., National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Elliott Moore and Hans J. Lehmann, Attorneys, National Labor Relations Board, were on the brief, for respondent.

Mr. Wayne S. Bishop, Washington, D. C., for intervenors, Tile Contractors

Association of America, Inc., Texas State Tile & Terrazzo Co., et al.

Mr. Jerry D. Anker, Washington, D. C., for union intervenors.

Messrs. Louis Sherman and Elihu I. Leifer, Washington, D. C., filed a brief on behalf of the Building and Construction Trades Department, AFL–CIO, as amicus curiae.

Miss Leslie Thacker, Houston, Tex., filed a brief on behalf of Ceramic Tile Institute of America, et al., as amicus curiae.

Before McGOWAN, LEVENTHAL, and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This appeal concerns the provisions of the National Labor Relations Act ("Act"), 29 U.S.C. § 141 et seq., applicable to jurisdictional disputes. The particular jurisdictional dispute involves whether the job of applying a coat of mortar on a wall to be tiled should be given to the Plasterers or the Tile Setters (that is, to petitioner, Plasterers Local Union No. 79, Operative Plasterers and Cement Masons' International Assn., AFL–CIO, or to intervenor, Tile Terrazzo and Marble Setters Local Union No. 20 of the Bricklayers, Masons and Plasterers International Union).

Following a hearing pursuant to § 10 (k) of the National Labor Relations Act,[1] the National Labor Relations Board, hereafter "Board," awarded the work in dispute to the Tile Setters.[2] The issue is whether it was error for the Board to have conducted a 10(k) hearing after being timely advised that both unions had agreed to be bound by the decisions of the National Joint Board for the Settlement of Jurisdictional Disputes, an arbitration panel established by the Building Trades Department, AFL–CIO, hereafter the "Joint Board."

The Plasterers claim the Joint Board awarded the work to them,[3] and that it was error for the Board to make a 10(k) determination. The Board's position is that while it may not hold a 10(k) hearing when the parties to a jurisdictional dispute have agreed on a method for voluntary adjustment of the dispute, this bar does not arise unless all the parties to the dispute are bound by the voluntary adjustment procedure. Because the Board considers the employer to be a party to the dispute, and because the employers making work assignments in the instant disputes were not bound by the determinations of the Joint Board; the Board contends that it properly held a 10(k) hearing.

These questions are before this court on the petition of Plasterers to review, and the cross-application of the Board to enforce, a June 27, 1968 order in which the Board found that Plasterers had committed an unfair labor practice in violation of § 8(b) (4) (D) of the Act[4] by picketing Texas State Tile and Terrazzo Company (Texas State), and Martini Tile and Terrazzo Company (Martini), with the object of forcing these employers to assign the disputed work to employees represented by Plasterers.[5]

■ We agree with the Plasterers that the Board may not properly proceed to determine a jurisdictional dispute pursuant to § 10(k) when the disputing unions have agreed to settle their dispute through binding arbitration. In as much as the Board's finding of an 8(b) (4) (D) violation incorporates and relies on

---

1. 29 U.S.C. § 160(k).

2. The Board's Decision and Determination of Disputes under § 10(k) was issued on August 22, 1967, and is reported at 167 NLRB No. 23.

3. The Plasterers also argue that assuming statutory authority to make an award, the Board's decision and order were arbitrary as reflecting an excessive weight given by the Board to the factor of the

employer's assignment, and a failure to give due consideration to other factors which supported the Plasterers claim. Our disposition of this appeal makes it unnecessary to reach this question.

4. 29 U.S.C. § 158(b) (4) (D).

5. The Board's Decision and Order in the unfair labor practice phase of the case is reported at 172 NLRB No. 77.

an invalid 10(k) proceeding and award, the Board's order cannot be enforced.

## I   *The Jurisdictional Disputes*

The focus of these jurisdictional disputes can be traced to the development in the mid-1950's of the thin-set or adhesive method of applying tile. Previously it was necessary to set tile in a bed of wet plaster so that moisture would not be absorbed from the bonding agent before it hardened and formed a firm bond. The application of this setting bed or float coat was the work of tile setters. The thin-set method, on the other hand, employed new bonding agents which made it possible to apply tile directly to a smooth surface of dry plaster on a thin coat of dry-set mortar. The Tile Setters contended that they should prepare this smooth plaster surface just as they had prepared the wet setting bed. The Plasterers took the position that the tile setter was only entitled to apply his setting bed and that in the thin-set method it was the dry-set mortar and not the smooth and dry plaster surface which constituted the setting bed.

The order concerns picketing which was directed against two different employers, at the sites of two unrelated jobs. The first was the M. D. Anderson Library Job at the University of Houston. Southwestern Construction Co., the general contractor for an addition to the library, had subcontracted to Texas State, a tile contractor employing members of the Tile Setters Union, the work of preparing walls and applying tile to four stairwells and two restrooms on each floor of the eight story building. The tile setters did their initial work in the lavatories where they applied the smooth coat of plaster. The Plasterers claimed this work as theirs, and when this claim was rejected by Tile Setters they submitted the dispute to the Joint Board.

On November 9, 1966, the Joint Board awarded the work in dispute to the Plasterers except that "any coat to be applied wet the same day under tile" was to be placed by Tile Setters. The award stated: "In the thin-set or adhesive method of applying tile to walls and ceilings, the plasterer shall apply the first and second coats of mortar that is the scratch coat and plumb coat. The plasterers shall plumb, rod and square all walls, rod and level all ceilings and the tile setter shall apply the final setting bed for his tile."

Plasterers thereupon claimed the remaining work of applying a smooth plaster coat on the basis of the award. The Tile Setters refused to relinquish the work, contending that the smooth plaster coat was the tile setter's "setting bed" and that therefore the Joint Board Award actually supported their claim. On January 24, 1967, Plasterers established a picketline on the jobsite and a work stoppage ensued. Southwestern Construction Company filed an unfair labor practice charge with the Board against Plasterers. On February 10, 1967, the United States District Court for the Southern District of Texas granted the application of the Board's regional director for an injunction against the picketing and the pickets were removed.

On March 6, 1967, Plasterers requested that the Joint Board clarify its award in view of the contention of the Tile Setters that the award favored their claim. On March 15, 1967, the Joint Board issued a clarification which is set out in part in the footnote.[6]   The Joint Board made

---

6.   The Joint Board voted to clarify its job decision by stating that the coat of plaster material which is applied directly to the initial scratch coat or directly to clay tile or cement block walls is for the primary purpose of plumbing, rodding and squaring of walls to receive tile and, in accordance with the agreement of record and the decision of record referred to above, shall be assigned to plasterers.

The Joint Board, in recognition of the problems created by having two different trades working at the same time on separately identifiable work operations, further voted that if the tile to be adhered to the coat of plaster material applied to the initial scratch coat or directly to clay tile or cement block walls is set during the same work day in which such coat is applied the plaster materials

clear that the job of applying a smooth coat of plaster material to an initial scratch coat or to cement or clay tile walls was the work of the Plasterers unless the tile is set the same work day that such coat of plaster is applied.

The second job at which picketing occurred was at the Rainbo Bakery. Here there was no general contractor. Martini, who did not employ plasterers, had a direct contract with the owner calling for the tiling of two walls in one area of the bakery. Tile setters undertook to perform the application of a smooth coat of plaster to metal lath which had been tacked to masonry walls, and the application of dry-set mortar and tile to this plaster surface. The dispute was never submitted to the Joint Board. On March 17, 1967, two days after the clarification by the Joint Board described above, Plasterers picketed the jobsite for the purpose of having transferred to them that part of the work consisting of application of the smooth coat.

## II   The NLRB Proceedings

On April 6, 7 and 10 through 14, 1967, the Board held a consolidated § 10(k) hearing to determine these jurisdictional disputes. It issued its decision and determination on August 22, 1967. The Board rejected the Plasterers' contention that the notice of hearing should be quashed because the disputing unions had agreed on a method for voluntary settlement. It stated: "The Board has consistently held that the employer who assigned the disputed work must be a party to an agreement that purports to settle an existing jurisdictional dispute." On the merits of the dispute, the Board examined what it considered to be the

relevant factors and concluded that Tile Setters were entitled to the work in dispute inasmuch as there was no significant difference between the two employee groups in terms of skill, and the various factors involved were all consistent with the employers' assignment of the disputed work.

When Plasterers refused to comply with the Board's determination of the work disputes, the General Counsel of the Board issued a complaint against petitioner alleging a violation of § 8(b) (4) (D) of the Act. At the unfair labor practice hearing held on October 30, 1967, the parties agreed to submit on the record in the § 10(k) proceeding. In its decision and order of June 27, 1968, the Board again rejected Plasterers' claim that the 10(k) proceeding was improperly held and found that the union had violated § 8(b) (4) (D). The Board's order provides that the union shall cease and desist from the use of prohibited means to force or require Texas State or Martini to assign to Plasterers the disputed work at the Anderson Library and Rainbo jobs. The Board also ordered that Plasterers take the affirmative action of posting a notice indicating their intention to abide by the Board's cease and desist order. The Board's petition for enforcement is predicated on Plasterers' refusal to take this affirmative action.

## III   Mootness

A motion to dismiss this case as moot has been filed by intervenor Tile Setters, and the other union intervenors associated with them.[7] They argue that mootness follows from the fact that the Anderson Library and Rainbo Bakery

---

shall be applied by tile setters in the interest of efficient job operation.

7. The other Union Intervenors are: Bricklayers, Masons and Plasterers International Union of America, hereafter "Bricklayers", International Association of Marble, Slate and Stone Polishers, Rubbers & Sawyers, Tile & Marble Setters' Helpers & Marble, Mosaic and Terrazzo Workers' Helpers, hereafter "Helpers," and Local 108 of the Helpers.

Bricklayers is the parent organization of Tile Setters Local 20, whose members were performing the work sought by the Plasterers. The Helpers Union was also interested in the dispute because its members work directly with the Tile Setters, and would be replaced by members of another organization (Laborers' International Union of America) if the disputed work were assigned to the Plasterers.

jobs have been completed and that the Board's cease and desist order now proscribes conduct in which it would be impossible for the Plasterers to engage. Both Plasterers and the Board have filed memoranda arguing that the case is not moot.

■ Cease and desist orders of the Board aimed at remedying an unfair labor practice are frequently framed to account for changes in circumstances following the illegal practice. However, the issue of whether an unfair labor practice occurred is not mooted because the particular job involved has been completed. Local 74, United Brotherhood of Carpenters & Joiners v. NLRB, 341 U.S. 707, 715, 71 S.Ct. 966, 95 L.Ed. 1309 (1951); NLRB v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831 (1938); NLRB v. Plumbers Union of Nassau County, 299 F.2d 497 (2d Cir. 1962).

■ There is precedent permitting the Board to quash a 10(k) proceeding where there could only be a stale hearing, held three years after the incident, and to dismiss the 8(b) (4) (D) complaint on the ground that "no affirmative order issued by the Board could have any effect on the parties to the original controversy since the work had long since been completed," Tip Top Roofers, Inc. v. NLRB, 324 F.2d 773 (5th Cir. 1963). But here the Board has issued an affirmative order, requiring *inter alia* the posting of notices, and Plasterers has refused to comply. We see no basis on this record for concluding that the Board acted impermissibly in viewing the controversy as being sufficiently broad and enduring to make appropriate affirmative relief. If the posting order was lawful the Board was entitled to a judicial decree of enforcement. The case is not moot.

### IV  *Proper Construction of Section 10 (k) of the National Labor Relations Act*

■ The Board's reliance on the 10 (k) record and determination in reaching its conclusion that Plasterers had committed an unfair labor practice preserves the 10(k) issue as a part of the review of the unfair labor practice determination.[8] The case turns on the proper construction of § 10(k) of the National Labor Relations Act, one of the provisions added by the Taft-Hartley Amendments of 1947 as a result of Congressional concern over work stoppages arising out of jurisdictional disputes between unions.

Another provision added at the same time was § 8(b) (4) (D), set forth in the footnote,[9] which broadly prohibits a

---

8. "Since there is no independent review of § 10(k) work assignments, the only stage at which the [union] can contest the work award is on review of the § 8(b) ■ (i) (ii) (D) unfair labor practice order. If the § 10(k) order falls, the unfair labor practice order falls with it." NLRB v. Local 991, ILA, 332 F.2d 66 (5th Cir. 1964).

9. (b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or re-strain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \*

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

\* \* \* \* \*

However, § 8(b) (4) (D) must be read in the light of § 10(k) which provides:

(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8(b), the

union from picketing and other actions to induce employees not to perform services for their employer with the object of forcing the employer to assign work to a particular union or craft.

Section 10(k), also set forth in footnote 9, empowers the Board to determine the jurisdictional dispute out of which the unfair labor practice charge has arisen, unless, in the words of an abstention provision, "the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute."

The Board held this abstention language of § 10(k) inapplicable, even though the unions had agreed to be bound by the decisions of the Joint Board for the Settlement of Jurisdictional Disputes —a joint board with representatives of employers and employees,[10]—on the ground that the employer was also a "party" and had not agreed to this method for voluntary adjustment.

In our view the Board erred in claiming authority under § 10(k) of the Act to determine the merits of a jurisdiction-

*Meaning of Abstention Provision of § 10 (k)*

■ The crucial abstention provision does not require voluntary adjustment, or agreement on a method for voluntary adjustment, on the part of all parties to the 8(b) (4) (D) proceeding, or even all parties to the 10(k) proceeding. Abstention is commanded when "the parties to such dispute" have adjusted the dispute, or agreed on a method for the adjustment of the dispute. The text of § 10(k) shows that the term "such dispute" refers to the underlying jurisdictional "dispute out of which such unfair labor practice shall have arisen." It is not the employer but the rival unions (or other employee groups) who are the parties to the jurisdictional dispute contesting which employees are entitled to seek the work in question.

Congress could have written § 10(k) so that the employer would be a necessary party to a procedure for voluntary

---

Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

10. The amicus brief filed by the Building and Construction Trades Department, AFL-CIO, urging the adoption of the construction of § 10(k) advanced by Plasterers, describes the operation of the Joint Board. Article X of the Department's constitution provides that all jurisdictional disputes shall be settled and adjusted according to a plan established by the Department and that such plan "shall be recognized as final and binding upon the Department and upon all affiliated National or International Unions and their affiliated Local Unions." The disputing

unions in the instant case, the Bricklayers and the Plasterers International Unions and their affiliated locals, the petitioner and intervenor, are affiliated with the Department.

The present "Plan for National Joint Board for Settlement of Jurisdictional Disputes" became effective on April 1, 1965. The Plan operates through the Joint Board, the Appeals Board and Hearings Panels established to render nationally effective decisions on an ad hoc basis. These Boards and Panels have both labor and contractor members, and the criteria for decision include inter-union agreements dividing work (the Green Book), established trade practice, practice in the locality and such factors as efficiency and economy of operation. The machinery of the Plan is operative regardless of whether or not the particular employer affected by such a dispute decides to be bound to the Plan. The Plan provides that any decision of the Joint Board, or of the Appeals Board if an appeal is taken, "shall be immediately accepted and complied with by all parties to this Agreement."

settlement by requiring agreement on such a procedure by both the parties to the unfair labor practice charge and the parties to the underlying dispute out of which that charge arises. That Congress did not choose this approach but instead required only agreement by the unions involved in the underlying jurisdictional dispute is easily understood in the light of the refusal of Congress to bind the employer to the Board's determination of a jurisdictional dispute under § 10(k). Rather than enacting a comprehensive solution to the work assignment problem, which would have required provision for binding the employer to a determination concerning who was entitled to the work, Congress went only so far as to assure that at least the employer would not be plagued by the failure of the disputing unions to resolve their dispute. The fact that the employer is not bound by a 10(k) determination of the Board is persuasive evidence that Congress did not intend a voluntary procedure for adjustment to be held inadequate because the employer is not bound.

Although the precise question before us is in any meaningful sense, one of first impression in the federal court,[11] we find authority for our view not only in the text of § 10(k) but also in judicial precedents construing the provisions of the Act dealing with jurisdictional disputes and in the legislative history and congressional purpose underlying these provisions.

*Protection Pending Determination under Voluntary Procedure*

We interject preliminarily the observation that the provision for Board abstention pending resort to a voluntary adjustment procedure does not remove the machinery provided by the Act for interim protection against work stoppages.

Congress gave to the Board authority to insure that the jurisdictional dispute will not be the cause for further work stoppage while either voluntary procedures, or Board-conducted procedures for determination under § 10(k), are running their course. Section 10(l), quoted in the footnote,[12] authorizes the

11. We do not read the cases cited in footnote 2 of the dissenting opinion as authoritative support for the Board's position. While we would not pass over a reasoned view contrary to the one here taken, these cases do not attempt to grapple with the issue before us apparently for the reason that they are not cases where the Board's interpretation was challenged or where disposition turned on the resolution of this issue. The Board's brief candidly admits that these cases have no more than "adverted to" the issue before us and contends merely that they "reflect" its view.

12. (l) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b) (7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further*, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: *Provided further*, That such officer or regional attorney shall not apply for any restraining order under section 158(b) (7) of this title if a charge against the employer under section 158(a) (2) of this title has

Board to seek a District Court injunction whenever the cognizant Board employee has reasonable cause to believe in the truth of a charge of an unfair labor practice violative of § 8(b) (4) (D). That injunction remains in effect "pending the final adjudication of the Board with respect to such matter." Where the Board is conducting a 10(k) proceeding it must make a final determination under § 10(k) before it may proceed to final adjudication of an 8(b) (4) (D) charge. In a case governed by the abstention provision of § 10(k) the proceeding on the 8(b) (4) (D) charge stays in being and is not dismissed unless and until the parties have not only agreed on methods for voluntary adjustment but have actually reached a voluntary adjustment of their dispute. Thus the Act provides a "speedy remedy * * * to preserve the status quo" [13] and avoids any hiatus in protection against forbidden means of pressing jurisdictional claims.

### CBS Opinion

Focusing on § 10(k) we find guidance and indeed instruction on its meaning, its inter-relationship with § 8(b) (4)

(D), and the pertinent legislative history, in NLRB v. Radio and Television Broadcast Engineers Union [CBS], 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

First, as to the meaning of the terms of § 10(k), the Supreme Court said (364 U.S. at 579, 81 S.Ct. at 334): "[T]he clause 'the dispute out of which such unfair labor practice shall have arisen' can have no other meaning except a jurisdictional dispute under § 8(b) (4) (D) which is a dispute between two or more groups of employees over which is entitled to do certain work for an employer." Since a jurisdictional dispute for purposes of § 10(k) is a "dispute between two or more groups of employees," it follows that these employee groups are "the parties to such dispute" for purposes of determining whether there exists a voluntary adjustment procedure within the abstention provision of 10(k).

Second, as to the purpose of § 10(k), the Court stressed that "§ 10(k) offers strong inducements to quarrelling unions to settle their differences * * *" 364 U.S. at 577, 81 S.Ct. at 333.[14] Where the quarrelling unions have agreed on a procedure for settling their differences,

been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b) (4) (D) of this title.

The vigilance of the General Counsel in applying for injunctions in 8(b) (4) (D) cases was noted in K. Strand, Jurisdictional Disputes in Construction: The Causes, the Joint Board and The NLRB 119, n. 1 (1961).

13. Local 450, International Union of Operating Engineers, AFL–CIO v. Elliott, Regional Director, 256 F.2d 630, 634 (5th Cir. 1958).

14. This is reenforced by the Court's reference, to the history of these provisions, which came in the wake of a "continuing and widely expressed dissatisfaction with jurisdictional strikes." *See* 364 U.S. at 580, 81 S.Ct. at 335, where the Court continued:

As one of the forerunners to these very provisions of the Act, President Truman told the Congress in 1947 that disputes "involving the question of which labor union is entitled to perform a particular task" should be settled, and that if the "rival unions are unable to settle such disputes themselves, provision must be made for peaceful and binding determination of the issues."

the purpose of § 10(k) to induce settlement is manifestly served by respecting their use of the agreed procedure.

As to the purpose of § 10(k) and § 8 (b) (4) (D) taken together, the Court noted that the legislative history contained a recognition of "the necessity of enacting legislation to protect employers from being 'the helpless victims of quarrels that do not concern them at all'," id. at 580–581, 81 S.Ct. at 335, i. e. to protect the neutral employer caught in the crossfire between the disputing unions and unable to satisfy either, in other words "caught between the devil and the deep blue." 364 U.S. at 575, 81 S.Ct. at 332. The purpose of protecting the neutral employer is fully served by any binding settlement between the disputing employee groups. The neutral employer is one who cares not how the dispute is decided but wants merely that it be decided.

*Further Examination of Legislative History*

■ We have undertaken a fresh examination of the relevant legislative history. That history forcefully supports the conclusion that Congress intended in § 10(k) to encourage disputing unions to establish inter-union machinery for settling jurisdiction disputes and to afford them an opportunity to exhaust this machinery.

The original House bill contained nothing comparable to § 10(k). Senator Morse, who proposed the forerunner provision which emerged, with relatively minor modification, as § 10(k), prepared a "definitional" memorandum, which stated that while there are various kinds of "jurisdictional disputes" they have as their common ingredient a controversy between two or more labor unions." I Legis.Hist. 951.[15]

Senator Morse proposed a subsection (k) which, as appears from its text in the footnote,[16] is virtually the same as what is now § 10(k). It provided for Board determination of "the dispute out of which such unfair labor practice shall have arisen" unless "the parties to such dispute * * * have adjusted or agreed upon methods for the voluntary adjustment of such dispute." (Senator Morse also proposed enlargement of definition of unfair labor practices and authority in the Board to seek Federal injunctions pending determination of the disputes.) In supporting his proposal he referred to his own experience during World War II as a member of the War Labor Board whose undertaking of jurisdiction to determine jurisdictional dispute work stoppages resulted in a policy whereby "we would give the union leaders involved in a jurisdictional dispute 24 hours to proceed to settle the dispute without a work stoppage, and upon their failure to do so we would appoint an arbitrator whose decision would be final and binding." And he predicted that the same incentive to union settlement would follow from the post-war adoption of his

15. "Legis. Hist." refers to the compiled Legislative History of the Labor Management Relations Act, 1947, published by the NLRB (1948).

16. *See* II Legis. Hist. 987: "(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (2) (A) of section 8(b), the Board is empowered to hear and determine the dispute out of which such unfair labor practice shall have arisen or to appoint an arbitrator to hear and determine such dispute, unless, within 10 days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or the arbitrator appointed by the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

The § 8(b) (2) (A) proposed by Senator Morse was similar to what has become § 8(b) (4) (D), though it defined an unfair labor practice in terms of an inducement to refuse services "because particular work tasks of such employer or any other employer are performed by employees who are or are not members of a particular labor organization." II Legis. Hist. 986.

proposal to amend the National Labor Relations Act. He stated:

> [P]robably one of the greatest benefits that will come from the adoption of such amendments to the Wagner Act as I am proposing this afternoon will be action on the part of the unions themselves to see to it that it does not become necessary, unless in exceptional cases, to resort to the machinery which I have proposed in these amendments * * * because the unions themselves will proceed to establish within their own organizations machinery capable of settling such disputes short of economic action.[17]

While in some respects the Congress departed from Senator Morse's proposals,[18] Congress retained the thought obtained from his subsection (k), of a machinery for Board determination, an abstention provision where the parties agree on a procedure for settlement, and of an incentive to determination by the parties to the dispute. And there can be no doubt that the parties to the jurisdictional dispute were conceived of as the rival unions, or employee groups. This appears not only from the presentation of Senator Morse, but from the use of the same core concept of the underlying dispute as the jurisdictional dispute between the unions, in the House Conference Report, a document of highest standing in ascertaining legislative intent.

In its recommendation for adoption of § 10(k), the House Conference Report stated:

The Senate amendment also contained a new section 10(k), which had no counterpart in the House bill. This section would empower and direct the Board to hear and determine *disputes between unions* giving rise to unfair labor practices under section 8(b) (4) (D) (jurisdictional strikes). [Emphasis added.] [19]

There was general agreement on the view that § 10(k) had merit as stimulating settlement machinery *within the ranks of labor*, agreement even from legislators opposed to other elements of the new law.[20]

*Consideration of the Board's Contrary Construction of § 10(k)*

The meaning of § 10(k) as we understand it is contrary to the construction announced by the Board. That agency's construction is entitled to deference. However, the text, legislative history and purpose, and precedent, combine to negative the aura of doubt which creates the occasion for giving weight to the Board's construction. *See CBS, supra,* 364 U.S. at 585, 81 S.Ct. 330, 5 L.Ed.2d 302; Truck Drivers and Helpers Local Union 728 of Intern. Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO v. NLRB, 101 U.S.App.D.C. 420, 249 F.2d 512 (1957), cert. denied, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533 (1958). If there was room for doubt prior to *CBS*, that decision should have alerted the Board to modify its interpretation.[21]

17. II Legis. Hist. 983.

18. His subsection (k) was modified so as to make Board determination compulsory rather than discretionary and to remove the provision authorizing reference by the Board to an arbitrator.

19. I Legis.Hist. 561.

20. *See* Legis.Hist. 1046, setting forth Senator Murray's favorable comment on this provision:
> We are confident that the mere threat of governmental action will have a beneficial effect in stimulating labor organizations to set up appropriate machinery for the settlement of such con-

troversies within their own ranks, where they properly should be settled.

21. In the wake of *CBS*, departing as it did from long-standing precedents and approach of the Board, commentators probing the various interrelated problems in depth attacked the Board's continuance of its definition of "parties" for purposes of § 10(k) abstention provision.
> *See* Sussman, Section 10(k): Mandate for Change?, 1967 B.U.L.Rev. 201, 229 ("The NLRB is incorrect in presently requiring that the employer be a party to an agreement procedure before it satisfies the standards necessary to avoid a Section 10(k) hearing"); ABA Sec-

Nor is the Board's construction entitled to greater deference because of the mere fact that the 1959 amendments to the Taft Hartley Act did not modify § 10(k). Reenactment of a section of law does not of itself constitute conclusive legislative approval of either decisions or administrative regulations construing the provision, in the absence of a showing that the attention of Congress was specifically directed to the matter at hand. That is the teaching of Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604 (1940), and Girouard v. United States, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), decisions whose vitality is underscored by the very recent opinion in Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In *Boys Market* the Supreme Court reiterated its stricture against assigning conclusive weight to congressional silence as acceptance of a ruling "in the absence of persuasive circumstances evidencing a clear design" that congressional inaction denoted acquiescence.

Although the Taft-Hartley Act was amended in 1959, there is no indication that Congress gave consideration to the issue now before us, or even to the subject of jurisdictional strikes. Its inaction concerning a provision whose meaning we do not find really doubtful is not accompanied by any circumstances or indications from which we can discern a "clear design" to accept the Board's rulings.

### Additional Court Precedent

We are in accord with the reasoning in Penello for and on behalf of N.L.R.B. v. Local Union No. 59, Sheet Metal Wkrs. Int. Assn., 195 F.Supp. 458 (D.Del.1961), which rejected the view that the employer's resistance "could be the sole factor making inoperative" the "voluntary adjustment" abstention provision of § 10(k). Judge Wright declared (at p. 466):

Petitioner would have the Court ignore this policy of § 10(k), however, for his theory apparently is that no agreement between the groups of employees involved can stay the operation of § 8(b) (4) (D) so long as the employer does not agree. But this argument proves too much, for not only does the Supreme Court view the policies of § 10(k) as directed towards inducing voluntary settlement between the groups of employees involved, but also the language of that section would seem to compel it.

### Rejection of Policy Argument of Board Counsel Overstressing Need To Obtain Employer Acquiescence

To this court counsel for the Board presented an argument on policy grounds that the Board's construction of § 10(k) is sound because it is best suited to preservation of industrial peace. We were not specifically cited to Board opinions wherein this policy was set forth by the Board as contrasted with argument of counsel. See Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). But let us consider the contention on its merits.

Board counsel argue (Brief at 17):

Employer acceptance of the "voluntary adjustment" is a prerequisite of final resolution of the dispute, because the employer does not commit an unfair labor practice by ignoring the award made under Section 10(k). * * * Securing the employer's participation in the dispute-settlement phase enhances the likelihood * * * that he will accept the result. * * *

A similar starting point, that the employer is not bound by the 10(k) deter-

tion on Labor Relations Law, Report of the Special Committee on the Building and Construction and Industry 452, 456 (1965) ("By the term 'parties' those legislators who discussed the matter indicated that Congress means the dis-

puting unions themselves."); Cohen, The NLRB and Section 10(k): A Study of the Reluctant Dragon, 14 Lab.L.J. 905, 909 (1963); Note, 77 Yale L.J. 1191, 1201–1202 (1968).

mination was the premise of the argument made by the Board in CBS—and without success.[22] This approach harbors the difficulty of a built-in tendency (not necessarily an absolute rule) to give controlling weight to the determination of the employer—because he is not required to comply with the determination of the Board. A similar appraisal was part of the Court's reasoning in CBS for rejecting the Board construction there involved (364 U.S. at 579, 81 S.Ct. at 334):

> For, in the vast majority of cases, such a narrow determination would leave the broader problem of work assignments in the hands of the employer, exactly where it was before the enactment of § 10(k)—with the same old basic jurisdictional dispute likely continuing to vex him, and the rival unions, short of striking, would still be free to adopt other forms of pressure upon the employer.

*Scope Given Voluntary Arbitration Procedures*

Our conclusion that agreement for binding arbitration between the disputing unions is effective to stay a determination by the Board under § 10(k) is also supported by the general principle that full scope should be given to voluntary arbitration procedures. Carey v. Westinghouse Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). Not least of the advantages is the relative speed of voluntary arbitration, as compared with Board adjudicatory procedures—a matter of manifest significance in the handling of jurisdictional strikes.[23]

*Importance of Permanent Resolution of Dispute*

Furthermore, and significantly, the availability of a binding agreement between the disputing unions creates means of enforcing a permanent resolution of the jurisdictional dispute not otherwise available to the Board. The Act does not authorize the Board to compel an employer to change his assignment, or a union to renounce an assignment that the employer is willing to give. But an award arising out of voluntary binding arbitration can be enforced by peaceful means. The impetus for unions to live up to inter-union agreements rests on reinforcing considerations of honor, reciprocity, mutuality—and enforceability. The winning union may bring an action, either in federal court under § 301 of the Taft-Hartley Act or in state court, to secure injunctive relief against a union that has failed to abide by its agreement to honor the Joint Board decision and renounce the work.[24] While delay may be involved before the union can secure an adjustment in fact, e. g., by prevailing in its suit for enforcement of the arbitration agreement, the public interest is safeguarded in the interim by the injunction obtained under § 10(l). That injunction remains in effect pending the ultimate adjustment, and may, indeed, give the winning union incentive to pursue with diligence legal enforcement of an award in its favor. Problems may

---

22. It argued that if a striking union which had no claim to the work under a Board order or certification, or a contract, established its right to the work upon the basis of such factors as custom, tradition, etc., it would be necessary, in order to prevent the 10(k) determination from being "virtually pointless," to construe 8(b)(4)(D) as permitting a union to strike to compel compliance with a 10(k) award. (Br. for NLRB at 9, 10, 20–26.) This would "encourage the very jurisdictional strikes which the Sections were intended to prevent." (Br. for NLRB at 25.)

23. K. Strand, Jurisdictional Disputes in Construction: The Causes, The Joint Board and the NLRB 103–104 (1961).

24. Additional avenues to enforcement are provided by the Joint Board itself. The Joint Board's procedural Rules and Regulations set out compliance procedures which provide, *inter alia*, that when a union is declared to be in noncompliance, no job decisions shall be issued in favor of that trade pending compliance.

arise in fact under this procedure if the employer tempts the losing union with continued offers of the work in dispute, but to give the losing union a legal right to another bite at the apple in the 10(k) proceeding is only to permit the jurisdictional battle to begin anew as a matter of right and principle, whereas a central objective of § 10(k) is to strengthen enforcement of agreements reached by the unions.

The construction of § 10(k) approved today means that proceedings on 8(b) (4) (D) unfair labor practices charges may be terminated because of union agreements reached after the proceedings are begun. But that is precisely the purpose of § 10(k) as expressed in *CBS,* where the Court said (364 U.S. at 576–577, 81 S.Ct. at 332):

> Section 10(k) * * * quite plainly emphasizes the belief of Congress that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed upon unions.

It also means that proceedings may be dismissed although an employer is dissatisfied with, and would prefer to contest and litigate, the agreement reached by the unions. The special provisions were passed, however, to protect the employer who was "neutral" in the dispute.

*Special Provisions of § 10(k) Inapplicable to Employers Not Truly Neutral in Jurisdictional Dispute*

█ An employer properly has standing under these provisions when he is plagued by employee groups that do not agree, and not when he is dissatisfied with the way they do agree. This principle has indeed been recognized by the Board's so-called Safeway doctrine in cases where an unfair labor practice violation has been followed by actual agreement between unions, with renunciation of the work.[25] In those cases the Board agrees that there is no longer a jurisdictional dispute.

The essential point is that the employer's economic interests do not require the Board to pursue the matter under § 10(k) even though (a) there was an unfair labor practice under § 8(b) (4) (D) in the first instance and (b) the employer is not really neutral as between the unions but makes it clear that he is dissatisfied with the adjustment on which they have agreed. The same principle is fairly operative when the unions have agreed on a method for obtaining an adjustment, a binding arbitration that the unions will generally observe and have power to enforce.

█ The Taft-Hartley Act, though broad and unqualified in its terms, must be taken in light of its dominant purpose to protect "neutral" employers. This

25. Highway Truckdrivers & Helpers, Local 107, Int'l Bhd. of Teamsters (Safeway Stores, Inc.), 134 NLRB 1320 (1961); Local 1905, Carpet Linoleum & Soft Tile Layers (Butcher and Sweeney Constr. Co.), 143 NLRB 251 (1963).

In Quinn v. NLRB (Don Cartage Co.) 61 LRRM 2690 (1966) this court remanded a Board disposition of a 10(k) proceeding made on the basis of a decision by one union renouncing the particular work. This was *not* accepted as a settlement of the dispute by the other union. The Board decided that the dispute before it in the 10(k) proceeding should be limited to the particular work, leaving the broader dispute for reference to the new Joint Board established in 1965, which heightened provision for employer participation and attention to employer interests (*see* note 27, *infra*). That 1965 procedure to settle the broad dispute was established more than 10 days after the charge was filed in 1964, and hence, under the terms of § 10(k), came too late to be a mandatory procedure even if the 10(k) proceeding was viewed as extending to the broad dispute. This court held that the 10(k) dispute involved in that case was a broad dispute—the case having taken shape, by agreement of all parties, including the Board's General Counsel, as relating to the broad, continuing dispute, and a long proceeding, with full evidence, had been held on the issue given this scope. All that was involved was a ruling that on the facts of that case the Board had abused its discretion in endeavoring to narrow the dispute awaiting its determination.

aspect of the "common law" of labor relations has been infused into the meaning of the Act in cases involving the provisions of the law broadly prohibiting secondary boycotts.[26] A similar principle is also applicable to ensure the kind of application of the jurisdictional dispute provisions that was intended by Congress.

We need not consider whether in some other case the Board could continue with a § 10(k) proceeding because the rival employee groups had not reached an actual agreement and their agreement on a procedure for adjustment was subject to an infirmity that undercut its fairness and reliability as a method of achieving the industrial peace that is the ultimate objective of Congress.[27] It may also be that the Board has discretion to conclude that a paper agreement between disputing unions does not in fact reflect an operative mechanism likely to resolve the dispute. No such contention has been advanced by the Board either as to the general operation of the Joint Board plan or as to its handling of this particular inter-union dispute. Under these circumstances we hold that the presently operative Joint Board plan which creates in the unions not entitled to disputed work a legally enforceable obligation to renounce the work can be and was intended by Congress to be preserved as a private-ordering mechanism for the resolution of jurisdictional disputes. We conclude that § 10(k) was intended to give full play to this private-ordering mechanism, and requires the Board to abstain from adjudication while it is being pursued.[28]

■ Our understanding of the thrust of Federal labor policy as developed by Congress proceeds along lines congruous to those developed by the Supreme Court in Boys Markets, Inc. v. Retail Clerks, *supra*. There the Court reversed a ruling of but nine years standing in order to maintain the efficacy of the arbitration remedy—viewed in the large as furthered by an injunction preserving the status quo pending the arbitral process. The Court stressed the importance of mutuality—that an employer could not be

---

26. National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 625, 87 S.Ct. 1250, 18 L.Ed.2d 357; International Bhd. of Elec. Workers, Local 501 v. NLRB, 181 F.2d 34, 37 (2d Cir. 1950), affd., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

27. Thus, we need not consider the efficacy for purposes of § 10(k) of an inter-union proceeding that made no realistic provision for meaningful attention to the interest of the employer and to questions of efficiency. In the case before us we have a Joint Board of employers and employees and one that was specifically organized and maintained for the purpose of coping with the requirements of the Taft-Hartley Act and the need for the effective resolution of jurisdictional disputes. It is a Board that takes into account factors of economy and efficiency of operation. The construction industry is typically beset by conflicts in which a group of employees and their employers (sometimes, of course, subcontractors) are likely to be aligned with each other as against another alignment of a different group of employees and their employers.

28. We do not determine whether the rule of this decision should be retroactive to prior 10(k) determinations in cases other than the one before us. The Supreme Court has in various instances given only prospective effect to rulings that upset a previous course of decision. See Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) and cases there cited. In some cases our court, in overturning a long-standing administrative construction of a statute, has held that the balance of public interest is best served by withholding completely retroactive effect to our ruling. Blair v. Freeman, 125 U.S.App.D.C. 207, 370 F.2d 229 (1966). Certainly our ruling would be applicable to any subsequent 10(k) decision, for the Board would be on notice of the infirmity. See Zuber v. Allen, 396 U.S. 168, 197, 90 S.Ct. 314, 24 L.Ed. 2d 345 (1969). As to the applicability of our ruling to decisions previously issued by the Board, we do not clearly discern the possible shape of the problem, and therefore we defer decision on what course will best effectuate the Federal labor policy contemplated by Congress.

held to his contract to pursue the arbitration remedy if he could not obtain effective relief (including pendente lite injunction) to enforce the union's similar obligation. Our situation is marked by technical differences but similarity in principles. As we have noted, Board abstention under § 10(k) in favor of an arbitration agreement is accompanied by injunctive relief to maintain the status quo pending the conducting of the arbitration and the enforcement of the award. And the pattern we find in the Act avoids a lack of mutuality since the employer cannot interfere with arbitration on the ground that he desires to permit the Board to conduct a proceeding and issue an order that he is not obligated to observe.

Accordingly the petition to review is granted; the petition for enforcement is denied; and the Board's order of June 27, 1968, 172 NLRB No. 77 is set aside.

So ordered

MacKINNON, Circuit Judge (dissenting):

Since its amendment over twenty years ago, the decision of the National Labor Relations Board [1] (NLRB) and the federal courts [2] have assumed that the National Labor Relations Act requires both the employer and the unions charged with committing an unfair labor practice under section 8(b) (4) (D) [3] to agree to be bound by an arbitration before the NLRB may be divested by

---

1. United Brotherhood of Carpenters, etc., Local 581 (Ora Collard), 98 NLRB 346, 348–349 (1952); Int'l Union of Operating Engineers (Empire State Painting Co.), 99 NLRB 1481, 1484–1486 (1952); International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO (Pittsburgh Plate Glass Co.), 125 NLRB 1035, 1038–1039 (1959); United Assn. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, 108 NLRB 186, 197 (1954); Millwrights Local 1102, United Brotherhood of Carpenters and Joiners of America, AFL–CIO (General Riggers and Erectors, Inc.), 127 NLRB 26, 29 (1960); Newspaper and Mail Delivers' Union (News Syndicate Co.), 141 NLRB 578, 580 (1963); International Union of Operating Engineers, Local 66 (Frank P. Badolato & Son), 135 NLRB 1392, 1395–1396 (1962); Local 173, Wood, Wire and Metal Lathers' International Union, AFL–CIO (Newark and Essex Plastering Co.), 121 NLRB 1094, 1103–1104 (1958); Bay Counties District Council of Carpenters, Inc., 115 NLRB 1757, 1766–1767 (1956); Local 450, International Union of Operating Engineers, AFL–CIO (Sline Industrial Painters), 119 NLRB 1725, 1731 (1958), enforced, 275 F.2d 408 (5th Cir. 1960); Local 825, Int'l Union of Operating Engineers (Nichols Electric), 137 NLRB 1425, 1428–1429 (1962), enforced, 326 F.2d 213 (3d Cir. 1964); Local 964, United Brotherhood of Carpenters (Carleton Bros.), 141 NLRB 1138, 1142 (1963); Local 68, Wood, Wire & Metal Lathers, etc. (Acoustics & Specialties, Inc.), 142 NLRB 1073, 1076 (1963); Local 825, Int'l Union of Operating Engineers (Schwerman Co. of Pa., Inc.), 139 NLRB 1426, 1429 (1962); Carpenters District Council of Denver Inc. (J. O. Veteto & Son), 146 NLRB 1242, 1245 (1964); Electrical Workers. Local 26, etc. (McCloskey & Co.), 147 NLRB 1498, 1501–1503 (1964); Carpenters Local Union No. 1622 (O. R. Karst), 139 NLRB 591, 594 (1962); Operative Plasterers Local No. 65 (Twin City Tile & Marble Co.), 152 NLRB 1609 (1965); Local 300, United Assn. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (D'Annunzio Bros., Inc.), 155 NLRB 836 (1965).

2. *See* New Orleans Typographical Union No. 17 v. N. L. R. B., 368 F.2d 755, 763 (5th Cir. 1966); N. L. R. B. v. Local 825, International Union of Operating Engineers, AFL–CIO (Nichols Electric Co.), 326 F.2d 213, 216 (3rd Cir. 1964); Local 450, International Union of Operating Engineers, AFL–CIO (Sline Industrial Painters) v. Elliott, 256 F.2d 630, 636 (5th Cir. 1958). *See also* Carey v. Westinghouse Electric Corp., 375 U.S. 261, 264, 84 S.Ct. 401, 11 L.Ed.2d 320 (1963), citing Wood, Wire & Metal Lathers Union, 119 NLRB 1345, 1347 (1958).

3. The unfair labor practice is defined by § 8(b) (4) (D) which provides:
   It shall be an unfair labor practice for a labor organization or its agents—
   *     *     *     *     *
   (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in

section 10(k) [4] of jurisdiction to hear and decide the issue.

The majority opinion here would reverse all these administrative and court decisions and hold that the NLRB has no jurisdiction to decide such disputes where the two unions involved are members of the AFL Building and Construction Trades Department if both have agreed to be bound by the decisions of the National Joint Board for the Settlement of Jurisdictional Disputes (Joint Board) [5] established by that labor organization.

In this case the NLRB found that the Plasterers Union committed an unfair labor practice under section 8(b) (4) (D), but the majority opinion would sustain the Plasterers' claim that the NLRB was without jurisdiction to hear and determine the dispute because the two unions (Plasterers and Tile Setters) had agreed upon a voluntary method of adjusting the dispute notwithstanding the fact that the employers had not agreed to be bound by such decision. The principal contention of the Plasterers, which is sustained by the majority opinion, is that the employers' consent to be bound

by such decision is not required under section 10(k).

The NLRB contends the employers are parties to the dispute and since it is admitted they have not agreed to be bound by the Joint Board determination of the dispute between the two unions that the NLRB is empowered and directed to make a binding determination of the dispute that will be controlling upon all the parties. The majority opinion bases its decision upon (1) alleged legislative history and (2) a single sentence in a 1961 Supreme Court decision. Both of these grounds have a similar cast to them as both involve isolated comments addressed to describing the garden variety of jurisdictional disputes and neither were in any way addressed to the problem that is before the court here of the NLRB's power and duty to adjudicate unfair labor practices caused by jurisdictional strikes in violation of section 8(b) (4) (D). See section 10(a).

In asserting reliance on the legislative history, petitioner cites the article in 52 Georgetown Law Journal 314 by counsel in this case. This article published in 1964 favored the Joint Board approach to jurisdictional disputes and it

an industry affecting Commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

  *   *   *   *   *

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work. 29 U.S.C. § 158(b) (4) (D).

4. Section 10(k) provides:
  Whenever it is charged that any person has engaged in an unfair labor

practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed. 29 U.S.C. § 160(k).

5. This board was created pursuant to an agreement of October 17, 1949 by the Building and Construction Trades Department of the AFL, the Participating Specialty Contractors Employers' Association and the Associated General Contractors of America, Inc. See 53 Geo.L.J. 130 n. 198 (1964).

has spawned several later articles that adopt the same thesis that somehow the legislative history of section 10(k) supports the position here asserted on behalf of the Joint Board. The majority opinion adopts this argument. The feature of the "legislative history" that is relied upon to bring about this result is stated in the Georgetown Law Journal article to be:

> Certainly, the literal meaning of section 10(k) does not require the employer to be a party to a settlement of a jurisdictional dispute,[6] and *the legislative history of the Act makes no mention whatsoever of employer's participation in private settlements under section 10(k).* 52 Geo.L.J. 314, 332 (1964) (emphasis added).

In support of the italicized statement the article in a footnote cites five instances when Senators and Congressmen discussed jurisdictional disputes or strikes and did not mention employers' participation in private settlements under section 10(k). There is nothing exceptional about this and it has absolutely no bearing on the issue here. The fact that Congress did not discuss employer participation does not in any way indicate any congressional intent on the matter. The members of Congress just did not address themselves to the point. In addition, there is a very good reason they did not address themselves to the point and that was because at the time four of the five remarks were made, section 10(k) was not in its present form. The bill originated in the House and at that stage it merely defined jurisdictional strikes and made them unlawful. Section 10(k) was not then in the bill. This treatment of jurisdictional strikes was supplanted in the Senate bill by a section 10(k) the principal provision of which empowered and authorized the NLRB to appoint an arbitrator to hear and determine such disputes. This provision for the NLRB appointment of an arbitrator was removed in the Conference Committee and section 10(k) then for the first time assumed its present character. Thus, the failure of the five members of Congress to discuss 10(k) in its present form is explained by the fact that the bill did not reach its present form until after their quoted remarks. While the 10-day provision was always a part of 10(k) from the time it emerged in the Senate bill it attracted no notice because it was always overshadowed by the provision for the Board to appoint an arbitrator.

This explains why the members of Congress in four out of five instances cited did not even consider the issue we have here.[7]

However, Senator Morse did discuss section 10(k) after it had achieved its present form and he interpreted the provision as requiring the NLRB to decide jurisdictional disputes. Speaking on the Senate floor on June 4, 1947 on

6. Actually, the literal meaning of § 10(k) deals only with jurisdictional strikes against an employer and does not concern itself with jurisdictional disputes between unions. So long as jurisdictional disputes are confined to unions the NLRB has no jurisdiction under § 10(k). It is only when an unfair labor practice involves an employer through a jurisdictional strike that the NLRB has any jurisdiction. *See* Justice Douglas' opinion in Carey v. Westinghouse Elec. Corp., *supra*, 375 U.S. at 263–264, 84 S.Ct. 401. Senator Taft made this same point on June 21, 1947 in a radio address. He was addressing himself to the handling of jurisdictional disputes under § 10(k) after that section had attained its present form. He said:

> The President says the bill would force unions to strike if they wish to have a jurisdictional dispute settled by the National Labor Relations Board. This is not so. All the union has to do is to file a petition under the representation section. *How could this provision increase strikes when it is not effective at all until there is already a jurisdictional strike or secondary boycott in effect?* (Emphasis added). 2 Legislative History Labor Management Relations Act 1947, p. 1627.

7. *See* Legislative History Labor Management Relations Act 1947, Representative Hartley 615, Senator Morse 950, Senator Taft 1012, Senator Murray 1046, Senator Smith 1157.

the bill as reported by the House and Senate Conferees, Senator Morse said:

> I am especially disturbed about the amendment made in conference *which requires the Board itself,* rather than an arbitrator, *to decide these jurisdictional disputes.* I think the provision is completely unworkable. Under the provision *the Board will have to hear and decide the merits of the disputes* in the motion-picture industry and the controversy of over 50 years' standing between the teamsters and brewery workers unions, to mention only a few.[8] (Emphasis added). 2 Legislative History of the Labor Management Relations Act, 1947, p. 1554.

So the "legislative history" relied upon by the petitioner is not helpful and to the extent that the remarks of Senator Morse on June 5, 1947 may be considered to be in this category, they are adverse to petitioners. The truth of the matter is that the legislative history of section 10(k) does not afford any substantial assistance to its interpretation and the weakness of the majority opinion is demonstrated by its assertion that it does.

The Supreme Court decision is NLRB v. Radio and Television Broadcast Engineers Union [CBS], 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961), and the single sentence in that opinion which the majority opinion here relies upon comments upon a clause in section 10(k), as follows:

> [T]he clause "the dispute out of which such unfair labor practice shall have arisen" can have no other meaning except a jurisdictional dispute under § 8(b) (4) (D) which is a dispute between two or more groups of employees over which is entitled to do certain work for an employer. 364 U.S. at 579, 81 S.Ct. at 334.

Since neither the legislative history nor this sentence in the CBS decision addressed the problem here being considered, neither furnish any support for the conclusion reached by the majority opinion. The comments quoted in the legislative history and in *CBS* are correct as far as they go, but they do not touch the issue here. They are merely comments taken out of context and misapplied.

Another feature of the majority opinion that obscures the issue is its overemphasis on the "jurisdictional dispute" here involved and its underemphasis on the fact that the dispute had ripened into a jurisdictional strike against an employer and that based upon such conduct, unfair labor practice charges had been filed with the NLRB.

No person needs any support for the proposition that the most ordinary union jurisdictional dispute primarily involves the unions concerned but that conclusion does not support the finding that the employer is not a very vital party to a jurisdictional strike arising out of that underlying dispute and which subsequently becomes the subject of an unfair labor practice charge. The unions by their actions have made him a party to their dispute and the statute recognizes this fact. Also, the fact that the Joint Board has employer groups in its structure, indicates that employers do have a direct interest in their decisions.

The words "such dispute" in section 10(k) *refer to the dispute out of which the unfair labor practice arose* and the statute provides that is the jurisdictional *strike* in which the striking union attempts to force the employer to assign particular work to employees in its union. There is no question that the employer is a party to that dispute. In fact, an employer is a necessary party to any dispute involving an unfair labor practice under section 8(b) (4) (D) by its very definition. Clearly the unfair labor practice arises out of the *strike.* More remotely the jurisdictional strike in many cases arises out of the jurisdictional *dispute* [9] but no unfair labor practice

---

8. He did not address himself to the problem which arises under the Joint Board here. *See* note 5 *supra.*

9. This more remote dispute was what Justice Black was referring to in the *CBS* case, *supra* 364 U.S. at 579, 81 S.Ct. 330.

charge under section 8(b) (4) (D) ever arose solely out of a jurisdictional dispute between two unions. It requires "a strike" that involves an employer as one party.

Moreover, there are several interesting references to the interests of employers in jurisdictional disputes. The article in 52 Georgetown Law Journal 314 on Jurisdictional Disputes cited in the majority opinion recognizes at pp. 320–321 that " * * * an employer is not necessarily a neutral party unconcerned with which group performs the work. * * * " Also, in Carey v. Westinghouse Corp., 375 U.S. 261, 84 S.Ct. 401 (1964), Justice Douglas discusses jurisdictional disputes and points out several ways in which they may involve employers:

We have here a so-called "jurisdictional" dispute involving two unions *and* the employer. But the term "jurisdictional" is not a word of a single meaning. In the setting of the present case this "jurisdictional" dispute could be one of two different, though related, species: either—(1) a controversy as to whether certain work should be performed by workers in one bargaining unit or those in another; or (2) a controversy as to which union should represent the employees doing particular work. If this controversy is considered to be the former, *the National Labor Relations Act* (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.) *does not purport to cover all phases and stages of it.* While § 8(b) (4) (D) makes it an unfair labor practice for a union to strike to get an employer to assign work to a particular group of employees rather than to another, *the Act does not deal with the controversy anterior to a strike nor provide any machinery for resolving such a dispute absent a strike.*

    \*    \*    \*    \*    \*    \*

The Act and its remedies for "jurisdictional" controversies of that nature come into play only by a strike or a threat of a strike. *Such conduct gives the Board authority under § 10(k) to resolve the dispute.* 375 U.S. at 263–264, 84 S.Ct. at 404. (Emphasis added).

I find Justice Douglas' approach to this portion of the Act to be more reasonable than the finespun theory advanced in the majority opinion. After all, we are here faced with what all admit is an unfair labor practice that has been committed in violation of section 8(b) (4) (D). In such circumstances, section 10(k) should be read in conjunction with section 10(a) which provides:

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. *This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise.* \* \* (Emphasis added.) 29 U.S.C. § 160 (a).

In carrying out the various duties imposed upon it by Congress the NLRB has followed a policy for twenty years which favors and encourages the unions to settle their own differences by themselves. Even when a union starts a jurisdictional strike in violation of section 8(b) (4) (D), the NLRB will quash the proceedings under 10(k) if either union renounces any claim to the work.[10] It is only when the dispute is protracted that the NLRB carries out the regular hearing as directed by section 10(k).[11] This is a recognition of the changed status of the dispute which occurs when one or both unions enlarge the dispute between themselves to include the employer by engaging in a strike against that employer

---

10. *See* Local 1905, Carpet, Linoleum & Soft Tile Layers (Southwestern Floor Co.), 143 NLRB 251, 255–256 n. 7 (1963).

11. This is the representation in the NLRB brief as to agency policy.

in an attempt to obtain an advantage over their rival union.[12]

Such procedure by the NLRB must be considered to be a sound interpretation and application of the powers conferred upon it by the Act. The sound discretion they exercise in such matters also finds support in that provision of section 10(k) which requires the parties to

" * * * submit to the Board *satisfactory evidence* that they have adjusted, or agreed upon methods for the voluntary *adjustment* of, the dispute. * * * " (Emphasis added).

"Satisfactory evidence * * * [of] adjustment" to whom? Obviously to the NLRB. This vests the NLRB with discretion in the matter. This discretion is weighed against the overriding duty imposed on the NLRB to prevent any unfair labor practice and to exercise that power unaffected "by any other means of adjustment." § 10(a). This places a heavy responsibility upon the NLRB in a section 8(b) (4) (D) proceeding to determine that the settlement procedure is going to be effective to adjust the unfair labor practice (not just the jurisdictional dispute) before it dismisses the charge. I thus find the majority opinion that strikes at the heart of this procedure to be an unreasonable interpretation of the Act and find much more reasonable the 20-year administrative interpretation that has been placed by the Board upon these sections of the Act.

The Board's interpretation of its duties in these jurisdictional disputes has been regularly reported to Congress [13] and Congress has left section 10(k) unchanged even though it has made extensive revisions of the Act since 1947. It amended both sections (j) and (*l*) as well as 8(b) (4) (D) in 1959. Under such circumstances Congress is deemed to have accepted the construction placed on section 10(k) by the Board [14] and under such circumstances it is well settled that the contemporaneous construction of the statute by the agency charged with its administration and enforcement should be sustained.[15] I accordingly dis-

12. In New Orleans Typographical Union No. 17 v. N.L.R.B., 368 F.2d 755, 767 (5th Cir. 1966), the court remarked:
When the Union struck to enforce the work assignment it removed the controversy from the field of private contractual rights into the higher ambit of public rights.
It also made the employer a party to the dispute.

13. *See, e. g.,* Twentieth Annual Report of the National Labor Relations Board (G. P.O., 1956), p. 118; Twenty-first Annual Report of the National Labor Relations Board (G.P.O., 1957), p. 119; Twenty-third Annual Report of the National Labor Relations Board (G.P.O., 1959), pp. 101–102.

14. Labor Board v. Gullett Gin Co., 340 U.S. 361, 366, 71 S.Ct. 337, (1951). Such interpretation does not assign conclusive weight to congressional inaction. (*See* Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), cited by the majority opinion at page 185, *supra*. It merely points to the failure or refusal of Congress to amend this section when it was amending subsections on both sides of it as one factor in conjunction with the contemporaneous construction of the Act by the NLRB over 23 years, the provisions of the Act itself including section 10(a) and Mr. Justice Douglas' opinion in Carey v. Westinghouse Corp., *supra*, wherein he points out that "there is no question that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award," as pointing to a conclusion that the Act is not to be construed in the manner the majority opinion states. These are all indicia of congressional intent and that is the principle here relied upon; not *stare decisis* as in Boys Markets, Inc.

15. Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ; F.T.C. v. Mandel Bros., Inc., 359 U.S. 385, 391, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959) ; NLRB v. Coca-Cola Bottling Co., 350 U.S. 264, 269, 76 S.Ct. 383, 100 L.Ed. 285 (1956) ; Commissioner of Internal Revenue v. Estate of Sternberger, 348 U.S. 187, 199, 75 S.Ct. 229, 99 L.Ed. 246 (1955) ; United States v. Public Utilities Commission of California, 345 U.S. 295, 314–315, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) ; Union Mfg. Co. v. NLRB, 95 U.S.App.D.C. 252, 221 F.2d 532, 536, cert. denied, 349 U.S. 921, 75 S.Ct. 660, 99 L.Ed. 1253 (1955), and cases there cited ;

sent from the majority opinion that would overturn long-standing Board practices.

West Texas Utilities Co. v. NLRB, 87 U.S.App.D.C. 179, 181, 184 F.2d 233, 235

(1950), cert. denied, 341 U.S. 939, 71 S. Ct. 999, 95 L.Ed. 1366 (1951).